UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAMON GUTIERREZ,

                       Petitioner,

      v.

CARL DUBOIS, in his official capacity as
sheriff of Orange County, et al.,

                    Respondents.

**ORDER**

20 Civ. 2079 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Petitioner Ramon Gutierrez has been detained by Immigration and Customs

Enforcement ("ICE") since June 2019 at the Orange County Jail (the "Jail").  (Am. Pet. (Dkt.

No. 54) ¶ 2)  He brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, the

All Writs Act, 28 U.S.C. § 1651, and Article I, Section 9, of the U.S. Constitution (id. ¶ 9),

seeking an order of immediate release or, in the alternative, a bond hearing.  (Id. at 15)

Petitioner has also moved for a temporary restraining order directing his immediate release,

because of risks arising from the COVID-19 pandemic.  (Mot. (Dkt. No. 50))

        For the reasons stated below, the petition will denied, and the motion for a

temporary restraining order will be denied.

**BACKGROUND**

**I.     FACTS**

        Petitioner is 59 years old and is a citizen of the Dominican Republic.  (Am. Pet.

(Dkt. No. 54) ¶ 1)  He became a permanent resident of the United States in 1978.  (Id.;

Hernandez Decl. (Dkt. No. 59) ¶ 3)

In June 1988, Petitioner was convicted of attempted criminal possession of a controlled substance in the third degree in Supreme Court of the State of New York, New York County.  He was sentenced to five years' probation.  (Hernandez Decl. (Dkt. No. 59) ¶ 4)

In November 2002, a jury in Albany County convicted Petitioner of criminal possession of a controlled substance in the first degree and criminal sale of a controlled substance in the first degree.  (Id. ¶ 5)  Petitioner was on bail and absconded prior to sentencing. He fled to the Dominican Republic and was sentenced in absentia to 22 years to life in prison. (Id.)  He was apprehended in the Dominican Republic and was extradited to the United States in 2009 to serve his New York state sentence.  (Id. ¶ 7)

In September 2009, ICE initiated removal proceedings against Petitioner, who argued that he should be given an opportunity to leave the United States voluntarily.  (Id.)  An immigration judge denied the request and ordered Petitioner removed, but in 2013 the Board of Immigration Appeals ("BIA") reversed and terminated the removal proceedings against Petitioner without prejudice, holding that he should be given a reasonable opportunity to depart the United States voluntarily.  (Id.)

On May 10, 2019, the Albany County state court re-sentenced Petitioner to eight years' imprisonment (id. ¶ 9), and in June 2019 he completed his state sentence and was released from New York state prison into ICE detention.  (Id. ¶ 10)  ICE attempted to interview Petitioner at that time about his interest in departing from the U.S. voluntarily, but Petitioner refused to answer any questions concerning this subject.  (Id.)

In July 2019, ICE again initiated removal proceedings against Petitioner. Petitioner moved to terminate the removal proceedings, arguing that he was not an "arriving alien," given his extradition from the Dominican Republic.  (Id. ¶ 11)  An immigration judge

terminated the removal proceedings against Petitioner on September 4, 2019, concluding that Petitioner had not been provided with an opportunity to depart the United States voluntarily.  (Id. ¶ 13)

On October 4, 2019, ICE again initiated removal proceedings, and on January 30, 2020, an immigration judge ordered Petitioner removed.  (Am. Pet. (Dkt. No. 54) ¶ 3)  Petitioner has appealed his removal to the BIA; that appeal remains pending.  (Id.)

Petitioner claims that he "suffers from multiple underlying conditions including high blood pressure, asthma, heart arrhythmia (with a history of minor stroke), and severe degenerative lower lumbar disc disease and spondylosis requiring back surgery."  (Id. ¶ 1)  Petitioner further claims that his "health has been gradually declining since being detained by ICE," that he "requires significant medical care for his heart, back, ulcers, and asthma," and that the "Orange County Jail has failed to provide an appropriate level of care, leaving him to experience pain and suffering."  (Id. ¶ 12)  Petitioner further argues that "[t]he COVID-19 pandemic dramatically increases the risks to Petitioner's life as an older individual with underlying conditions."  (Id. ¶¶ 12, 34)

Petitioner claims that on some unspecified date he "submitted [a] detailed release request to ICE, which described the medical conditions that render him highly vulnerable to adverse health outcomes from COVID-19."  ICE denied Petitioner's request on May 5, 2020. (Id. ¶ 36)

## II.   <u>PROCEDURAL HISTORY</u>

On May 14, 2019, Petitioner – then proceeding <u>pro se</u> – filed a petition in this District pursuant to 28 U.S.C. § 2254 seeking release from detention or, in the alternative, a bond hearing.  (Pet. (Dkt. No. 2))  The Petition was subsequently transferred to the Second Circuit for

a determination as to whether it was successive.  (Dkt. No. 5)  On July 1, 2019, the Second

Circuit concluded that the Petition was not successive, and the case was returned to this District.

Given that Petitioner was convicted in Albany County, the action was then transferred to the

Northern District of New York.  (Dkt. No. 9)  Respondents moved to transfer venue to this

District.  (Dkt. No. 23)  In a February 25, 2020 order, a Northern District judge construed the

Petition as a "core challenge" to Petitioner's confinement under 28 U.S.C. § 2241, and granted

Respondents' motion to transfer.  (Feb. 25, 2020 Order (Dkt. No. 29) at 4)  The Petition was

returned this District on March 9, 2020, and assigned to this Court on March 12, 2020.  (Dkt. No.

30)

On April 22, 2020, Respondents filed their opposition to the Petition.  (Dkt. No.

37)  Petitioner then retained counsel, and on May 11, 2020, Petitioner moved to file an Amended

Petition.  (Dkt. No. 44)  On May 18, 2020, this Court granted that motion.  (Dkt. No. 47)

The Amended Petition was filed on May 22, 2020.  Petitioner again seeks release

from detention or, in the alternative, a bond hearing.  (Am. Pet. (Dkt. No. 54) at 15)  The

Amended Petition alleges (1) a substantive due process claim under the Fifth and Fourteenth

Amendments; (2) a procedural due process claim under the Fifth and Fourteenth Amendments;

(3) a Fourth Amendment unlawful seizure claim; and (4) an unlawful detention claim under 8

U.S.C. § 1225(b)(2).  (Id. at 14)

On May 22, 2020, Petitioner moved for a temporary restraining order directing his

immediate release, on the ground that Respondents' "continued detention of Petitioner [during

the COVID-19 pandemic] constitutes deliberate indifference to a medical need of the utmost

urgency."  (Pet. Br. (Dkt. No. 50-1) at 7)

On May 28, 2020, Respondents filed their opposition to the Amended Petition and Petitioner's motion for a temporary restraining order.  (Resp. Opp. Br. (Dkt. No. 56))

On June 5, 2020, Petitioner filed a reply, and on June 8, 2020, Petitioner filed an amended reply brief with minor corrections.  (Pet. Reply Br. (Dkt. No. 65); Pet. Am. Reply Br. (Dkt. No. 66-1))

## DISCUSSION

I.   **LEGAL STANDARD**

Under 28 U.S.C. § 2241, district courts may grant a writ of habeas corpus to any petitioner "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3))  The jurisdiction conferred by Section 2241 includes the power to grant a writ to non-citizens who are detained in violation of the Constitution.  Demore v. Kim, 538 U.S. 510, 516 (2003)) see also Hernandez v. Decker, No. 18 Civ. 5026 (ALC), 2018 WL 3579108, at *3 (S.D.N.Y. July 25, 2018) ("Under this provision, federal courts are empowered to hear claims by non-citizens challenging the constitutionality of their detention.").

II.   **ANALYSIS**

A.   **Section 1225(b)(2) Claim**

Petitioner contends that his "continued and prolonged detention . . . is unlawful and contravenes 8 U.S.C. § 1225(b)(2), as interpreted by the Supreme Court in Jennings v. Rodriguez, [138 S. Ct. 830] (2018)."  According to Petitioner, "8 U.S.C. § 1225(b)(2) only authorizes detention pending removal proceedings.  Petitioner's removal proceedings are not pending because he received an order of removal and is in the appeal process."  (Am. Pet. (Dkt. No. 54) at 14)

The Government argues, however, that removal proceedings against Petitioner are currently pending before the BIA.  (Resp. Opp. Br. (Dkt. No. 56) at 30)  Given that the Amended Petition pleads that "Petitioner appealed the [removal] decision to the [BIA].  The Appeal remains pending."  (Am. Pet. (Dkt. No. 54) ¶ 3), it is clear that removal proceedings are in fact pending against Petitioner.  Accordingly, Petitioner's Section 1225(b)(2) claim will be denied.

## B.  Fourth Amendment Unlawful Seizure Claim

Petitioner argues that the Government's "conduct violates Petitioner' right against unlawful seizure under the Fourth Amendment of the United States Constitution."  (Am. Pet. (Dkt. No. 54) at 14)  Nothing in the Amended Petition supports this claim; Petitioner states only that he "was extradited to the United States in 2009 to serve a state sentence . . . ."  (Id. ¶ 2)

In his reply brief, Petitioner asserts that "he was unlawfully apprehended and brought to the United States in violation of an international treaty making his ICE arrest and current detention fruit of an unlawful seizure."  (Pet. Am. Reply Br. (Dkt. No. 66-1) at 6) According to Petitioner, he

> resided peacefully in the Dominican Republic until 2009, when the Department of Homeland Security ("DHS") attempted to extradite him.  However, the Dominican Republic refused to extradite him because under an extradition treaty with the United States any sentence beyond 20 years was excessive.  It is unclear how the United States was able to detain Petitioner in the Dominican Republic while Petitioner was in the custody of Dominican authorities.  The government failed to provide either an explanation or evidence that Petitioner was legally apprehended and legally paroled into the United States.  It is unclear how the United States was able to obtain travel documents and parole documents for Petitioner.  All these documents are in the possession of the U.S. government, and the circumstances leave no possibility except illegal acts on the part of the U.S. government or its agents. . . . Petitioner . . . was kidnapped from the Dominican Republic to the United States in 2009 to serve a state sentence.

(Pet. Am. Reply Br. (Dkt. No. 66-1) at 7-8)

As an initial matter, Petitioner's attempt to plead facts in his reply brief is improper.  See Troy v. City of New York, No. 13-CV-5082 AJN, 2014 WL 4804479, at *1

(S.D.N.Y. Sept. 25, 2014), aff'd, 614 F. App'x 32 (2d Cir. 2015) ("the Court does not rely on factual assertions made for the first time in Plaintiff's opposition brief . . . as it is axiomatic that the Complaint cannot be amended by briefs") (internal quotation marks and citations omitted). In any event, Petitioner offers no more than speculation in support of his claim that the Government played some unspecified role in his allegedly unlawful apprehension in the Dominican Republic and extradition to the United States. Petitioner's "naked assertion[s] [are] devoid of further factual enhancement" and are insufficient to state a claim. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

Petitioner's Fourth Amendment claim will be denied.

### C.   Substantive Due Process Claim

Petitioner argues that his detention "constitute[s] deliberate indifference to Petitioners' medical needs, and thus violate the Fifth Amendment's substantive due process guarantee." (Am. Pet. (Dkt. No. 54) at 10)

The Fifth Amendment's Due Process Clause guarantees civil detainees the right to be free from deliberate indifference to their serious medical needs. See Avendano Hernandez v. Decker, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *2 (S.D.N.Y. Mar. 31, 2020) (citing Charles v. Orange County, 925 F.3d 73, 85-86 (2d Cir. 2019)). Deliberate indifference requires a two-part showing. First, Petitioner must establish that he has a serious medical need, which is one that "may produce death, degeneration, or extreme pain." Charles, 925 F.3d at 86 (citing Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). Second, Petitioner must establish that Respondents acted with deliberate indifference to that need. Id. To plead deliberate indifference, Petitioner must allege facts demonstrating that Respondents "knew [or should have known] that failing to provide the complained of medical treatment would pose a substantial risk

to [Petitioner's] health. . . ." Id. at 87. Such conduct "'involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm.'" Id. (quoting Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000)).

Respondents do not appear to dispute that Petitioner's underlying health conditions constitute a serious medical need in the context of the COVID-19 pandemic. Instead, Respondents argue that Petitioner "cannot make [a] showing" of deliberate indifference, because "ICE and the Orange County Jail have taken reasonable and appropriate steps to prevent and, if it becomes necessary, treat COVID-19 infection at the Orange County Jail, where there were zero confirmed cases of COVID-19 as of [May 28, 2020]." (Resp. Opp. Br. (Dkt. No. 56) at 42 (citing Mele Decl. (Dkt. No. 57); Flynn Decl. (Dkt. No. 58)))

There is no question that the COVID-19 virus presents an enormous risk to detainees. See United States v. Stephens, 2020 WL 1295155, at *2 (citing United States v. Raihan, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12-19 (E.D.N.Y. Mar. 12, 2020)). And Petitioner has alleged that he suffers from medical conditions that put him at special risk. Individuals who suffer from moderate to severe asthma and a serious heart condition are "at high-risk for severe illness from COVID-19." High-Risk Conditions, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (last accessed June 10, 2020). Accordingly, Petitioner has a serious medical need.

Petitioner has not demonstrated, however, that the Orange County Jail has acted with deliberate indifference to his serious medical need. Respondents have submitted a declaration from Anthony Mele – a Correctional Administrator at the Jail – that sets forth the Jail's extensive protocols for addressing the risks that the COVID-19 virus presents to detainees.

As discussed below, the Jail's protocols are in accordance with CDC guidelines. (Mele Decl. (Dkt. No. 57))

As of May 26, 2020, the Jail houses 366 inmates and detainees, of which 90 are ICE detainees. Given that the Jail can house as many as 802 detainees, the Jail is far below its maximum capacity. (Id. ¶ 4)  ICE detainees are housed exclusively in three specific housing units. Each unit features single-occupancy cells that are approximately 98 square feet, and which are "equipped with a pleated filtration system."[1] (Id. ¶ 6)  The Jail is also well-staffed with medical personnel, including "1 medical doctor; 1 psychiatrist; 10 registered nurses; 11 licensed practical nurses; 4 clinical social workers; 2 mental health nurse practitioners; 1 dentist[;] and 2 dental hygienists." (Id. ¶ 7)  In response to the COVID-19 pandemic, between March 23, 2020 and May 27, 2020, the Jail suspended ICE detainee intake. (Id. ¶ 9)

The Jail has implemented the following precautions in accordance with CDC guidelines: "All staff members wear masks"; "[a]ll inmates/detainees have been issued two reusable face masks which they are required to wear [and one of which] [t]hey are required to clean . . . daily"; and "[m]eals are provided in cells." (Id.)  "Detainees and inmates are permitted outside of their cells for up to 10 hours a day. During that time, inmate/detainees have 4480 square feet of space . . . [which] provides ample room for the inmates/detainees to engage in social distancing . . . in accordance with the CDC guidelines . . . ." (Id.)  Finally, the Jail has "increase[d] the general cleaning of the facility" and "provides disinfectant spray, bleach, hand

_____

[1]  "When pleated filters are used, additional filter media are added to reduce the air velocity through the filter media. This enables the filter to increase [particle] collection efficiency for a given pressure drop." Guidance for Filtration and Air-Cleaning Systems to Protect Building Environments from Airborne Chemical, Biological, or Radiological Attacks, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health at 8-9 (April 2003), https://www.cdc.gov/niosh/docs/2003-136/pdfs/2003-136.pdf?id=10.26616/NIOSHPUB2003136.

sanitizer, hot water, and soap in every housing unit . . . [which] are readily available to the inmate/detainee population."  (Id.)

The Jail also has protocols for testing and isolating detainees and inmates.  (Id.) New inmates are subject to screening and treatment protocols "in accordance with CDC guidelines," and the facility "has five testing kits on hand and can receive additional kits within 24 hours upon request."  (Id.)  "There is 1 ICE Detainee currently [q]uarantined due to being out of the building to hospital and returning," but "[t]here are no inmates/detainees quarantined due to suspicion of COVID-19," and no ICE detainees or inmates have tested positive or are symptomatic.  (Id.)  And while eight staff members have tested positive for the virus, "[n]one of these officers had contact with ICE detainees."  (Id.)

Petitioner argues that the Jail's protocols are inadequate, noting that the Mele Declaration "does not state whether inmates or staff always wear the masks they have been provided with."  Petitioner also complains that the Jail's protocols "do not consider the risks posed by asymptomatic carriers of the disease," and asserts that "[t]esting for the COVID-19 virus has [] been non-existent" at the Jail.  (Pet. Am. Reply Br. (Dkt. No. 66-1) at 15)  Petitioner further complains that, "in the common areas, it does not appear that detainees are being required to practice social distancing"; he "sees correctional officers without masks"; he "was not placed in quarantine after being taken to the hospital on May 15, 2020"; and the Jail "resumed intakes of ICE detainees on May 27, 2020."  (Id. at 16)

The law does not require the Jail to implement perfect measures to protect the health of detainees, however.  The Jail must instead implement sufficient measures such that it is not "reckless" or acting in "conscious disregard" of known risks.  Charles, 925 F.3d at 87.  No protocols or guidelines can entirely eliminate the risk of infection in an incarceratory setting.

10

Here, the Jail has implemented screening, testing, social distancing, hand hygiene, and mask-wearing. Given that no inmates or detainees at the Jail have tested positive for the virus, the measures implemented by the Jail appear to have been effective.

Other courts in this District have concluded that the Jail has reasonable measures in place to address the risks posed by the COVID-19 virus. See Dzhabrailov v. Decker, No. 20 Civ. 3118 (PMH), 2020 WL 2731966, at *8-9 (S.D.N.Y. May 26, 2020) ("[g]iven [the Jail's] precautionary measures, Petitioner cannot demonstrate that Respondents have acted with deliberate indifference to the medical needs of detainees housed within [the Jail]"); Ulger v. Barr, No. 20 Civ. 2952 (LTS), 2020 WL 2061473, at *4 (S.D.N.Y. Apr. 29, 2020) ("[w]hile the measures Respondents are taking to prevent the spread of COVID-19 within the [Jail] are necessarily imperfect, they are reasonable"); Graham v. Decker, No. 20 Civ. 2423 (PKC), 2020 WL 1847568, at *6 (S.D.N.Y. Apr. 13, 2020) (finding that petitioner detained at the Jail "has not demonstrated that defendants knew or should have known of a substantial risk posed to him and that they subsequently failed to take adequate or effective preventative measures").

The cases cited by Petitioner (see Pet. Br. (Dkt. No. 50-1) at 13-14; Pet. Am. Reply Br. (Dkt. No. 66-1) at 10-12) are not persuasive. Only one of these decisions addresses the Orange County Jail, and the court there considered a different factual record. Ferreyra v. Decker, No. 20 CIV. 3170 (AT), 2020 WL 1989417 (S.D.N.Y. Apr. 27, 2020) For example, in Ferreyra, the court stated that the "Orange County Jail does not provide masks to staff or detainees." Id. at *9. As discussed above, that is no longer the case. The other decisions cited by Petitioner involve different facilities and were issued in late-March or April 2020, when the COVID-19 pandemic was at an early stage and protocols to address the virus were in their infancy. See Basank v. Decker, No. 20-cv-2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar.

11

26, 2020) (finding that "Respondents could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another"); <u>Stephens</u>, 2020 WL 1295155, at *2 (granting bail because "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)"); <u>Coronel v. Decker</u>, 20-cv-2472 (AJN), 2020 WL 1487274, at *5 (S.D.N.Y. March 27, 2020) (finding that "the record contains no evidence that the Government took any specific action to prevent the spread of COVID-19 to high-risk individuals," such as testing, hygiene, or isolation protocols); <u>Barbecho v. Decker</u>, No. 20-CV-2821 (AJN), 2020 WL 1876328, at *4 (S.D.N.Y. Apr. 15, 2020) (noting that Bergen County Jail had no "special safety or hygiene protocols for . . . high-risk individuals or for staff interacting with them," and had "not provided high-risk individuals with any personal protective equipment, such as masks").

Petitioner also complains about the following non-COVID-19 health issues:

> [H]is overall health has quickly decreased while at Orange County Jail. The back surgery he was scheduled for in the summer of 2019 was cancelled after his transfer into ICE custody. While he has seen a cardiologist once on January 21, 2020, there was no follow-up regarding his heart condition until May 2020, after countless requests by both Petitioner and his attorney. The doctor at Orange County Jail has even prescribed medicine to Petitioner that the cardiologist identified as being inadequate and harmful to Petitioner.

(Pet. Br. (Dkt. No. 50-1) at 8)

In his declaration, Petitioner asserts that he

> suffer[s] from severe degenerative lower lumbar disc disease and spondylosis requiring back surgery. . . . [D]ue to my release from state custody and transfer into ICE detention in June 2019, [a] much-needed surgery was cancelled and never re-scheduled. . . . I have been in pain for so long, I feel like it has become part of me. . . . On four different occasions, Dr. Khouri has told me that I would die in detention. A nurse was in the medical office once when she said that. Another time, the health administrator, Marsha, was present too. . . . The medical personnel at the Orange County Jail has also failed to address my asthma. . . . Between June 2019 and August 2019, I repeatedly asked Dr. Khouri to allow me to keep a pump in my cell because the inhaler was not sufficiently helping me to breathe during my asthma attacks. I was only able to use the pump in the doctor's

office twice a day, which was not adequate as I need to use it at unexpected times during attacks. After months of complaining of my untreated heart issues, I finally got to see a cardiologist, Dr. Cuomo, on January 21, 2020. Dr. Cuomo informed me that some of the medication I was being given at Orange County Jail, hydrochlorothiazide, was worsening my state rather than improving it. Between January 24, 2020 and April 27, 2020, I was however still given this medication by the Orange County Jail medical personnel. Per the advice of my cardiologist, I refused the medication and informed the nurse practitioner of the reason for my refusal each time. On May 7, 2020[,] Dr. Cuomo also ordered that a cardiac catheterization be performed on me. On May 15, 2020, the cath[et]erization was performed on me. . . . Dr. Cuomo also ordered that I see a doctor specializing in arrythmia. Unfortunately, I do not have a timeline for when this will occur.

(Pet. Decl. (Dkt. No. 50-2) ¶¶ 12-20)

   While Petitioner has many complaints about the medical care he has received at the Orange County Jail, he has not demonstrated that Jail personnel are deliberately indifferent to his medical needs. Aside from his request for back surgery, Petitioner has not identified any health issue that has gone entirely unaddressed. Indeed, Petitioner received a heart catheterization procedure only eight days after it was ordered. While Petitioner's concerns about conflicting advice regarding the appropriate heart medication are understandable, a disagreement between medical professionals as to appropriate medication does not demonstrate deliberate indifference. In sum, Petitioner does not contend, and could not credibly contend, that he has gone without medical treatment for his heart condition.

   As to Petitioner's request for back surgery, all the record reveals is that Petitioner was allegedly scheduled for back surgery while in state custody, but for some unexplained reason the surgery was not performed during the time that Petitioner was serving his state sentence. Petitioner has not pled facts sufficient to demonstrate that the failure to provide him with back surgery while in ICE custody constitutes deliberate indifference.

   As to Petitioner's asthma condition, the Jail has provided him both with an inhaler for use in his cell, and access to a "pump in the doctor's office twice a day." (Pet. Decl. (Dkt.

No. 50-2) ¶ 17)  While Petitioner claims that he needs "to keep a pump in [his] cell," the Jail's failure to provide him with this implement in his cell does not demonstrate deliberate indifference.

Petitioner's substantive due process claim will be denied.

### D.    <u>Procedural Due Process Claim</u>

Petitioner claims that his right to procedural due process has been violated, because "the government failed to provide [him] with the necessary safeguards afforded arriving aliens.  Post <u>Jennings</u>, several district courts have considered the issue of arriving aliens detained for unreasonably prolonged periods of time under Section 1225(b) in the due process context." (Am. Pet. (Dkt. No. 54) ¶ 38)

The Government argues that, as an "arriving alien" under 8 U.S.C. § 1225(b), Petitioner "do[es] not possess a due process right to a bond hearing."  (Resp. Opp. Br. (Dkt. No. 56) at 31)  In support of this argument, the Government cites 8 C.F.R. § 1003.19(h)(2)(i)(B), which states that "an immigration judge may not redetermine conditions of custody imposed by the Service with respect to . . . [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act."  (<u>Id.</u> at 33 (quoting 8 C.F.R. § 1003.19(h)(2)(i)(B)))  In arguing that it is constitutional to detain Petitioner without a bond hearing pursuant to this regulation, the Government relies on <u>Shaughnessy v. United States ex rel. Mezei</u>, 345 U.S. 206 (1953), a case that arose during the Cold War.  (<u>Id.</u>)

In <u>Mezei</u>, the Attorney General detained petitioner – who was a lawful U.S. resident for twenty-five years before traveling "behind the Iron Curtain" for almost two years – on the grounds that petitioner's entry would be "prejudicial to the public interest for security reasons."  <u>Mezei</u>, 345 U.S. at 208, 214.  In holding that it was constitutional to detain petitioner

without a bond hearing for 21 months, the Supreme Court noted that the relevant regulations

were imposed "on aliens entering or leaving the United States during periods of international

tension and strife" and "continue[] in effect during the present emergency." Id. at 210.  Finding

that "admit[ting] an alien barred from entry on security grounds nullifies the very purpose of the

exclusion proceeding" (id. at 215-16), the Court held that "[w]hatever the procedure authorized

by Congress is, it is due process as far as an alien denied entry is concerned," and upheld the

Government's right to "exclude respondent without a hearing as authorized by the emergency

regulations."  Id. at 212, 214-15.

       "Neither the Supreme Court nor the Second Circuit has resolved the broad

question of whether an arriving alien detained pursuant to 8 U.S.C. § 1225(b) is entitled to a

bond hearing when his or her detention becomes unreasonable in violation of the Due Process

Clause of the Fifth Amendment."  Brissett v. Decker, 324 F. Supp. 3d 444, 450 (S.D.N.Y. 2018)

Numerous courts in this District have found such an entitlement, however, concluding that Mezei

is not applicable outside the national security context.  See Perez v. Decker, No. 18-CV-5279

(VEC), 2018 WL 3991497, at *3 (S.D.N.Y. Aug. 20, 2018) (aliens held pursuant to 8 U.S.C.

§ 1225(b) "have Due Process rights that require courts to consider challenges to the length of

their detentions"; finding nine months of detention without a bond hearing unconstitutional); Lett

v. Decker, 346 F. Supp. 3d 379, 386-87 (S.D.N.Y. 2018) (Supreme Court "explicitly tailored its

holding [in Mezei] to the national security context"; finding that ten months of detention without

a bond hearing violated Due Process rights); Birch v. Decker, No. 17-CV-6769 (KBF), 2018 WL

794618, at *6 (S.D.N.Y. Feb. 7, 2018) (acknowledging Mezei, but concluding that after "eleven

months of detention without a bond hearing . . . the Government's mandatory detention authority

under § 1225(b) has expired"); Kouadio v. Decker, 352 F. Supp. 3d 235, 241 (S.D.N.Y. 2018)

(finding that thirty-four months of detention without a bond hearing was unconstitutional because, unlike in <u>Mezei</u>, the Government did not argue that the case "gives rise to any particularized national security concerns"); <u>Lopez v. Sessions</u>, No. 18 CIV. 4189 (RWS), 2018 WL 2932726, at *13 (S.D.N.Y. June 12, 2018) (rejecting argument that under Section 1225(b) "hearingless detention of removable adult immigrants [is] constitutional"); <u>but</u> <u>see</u> <u>Poonjani v. Shanahan</u>, 319 F. Supp. 3d 644, 648 (S.D.N.Y. 2018) ("<u>Mezei</u>'s holding – that for aliens on the 'threshold of initial entry,' due process is whatever procedure has been 'authorized by Congress' – compels denial of the Petition here"); <u>Mendez Ramirez v. Decker</u>, No. 1:19-CV-11012-GHW, 2020 WL 1674011, at *14 (S.D.N.Y. Apr. 3, 2020) (relying on <u>Poonjani</u> to conclude that "<u>Mezei</u> . . . foreclose[d] [Petitioner's] due process claim" because he was detained pursuant to Section 1225(b)).

   This Court concludes that <u>Mezei</u> is properly limited to its facts, and that aliens may not be detained indefinitely without a bond hearing under Section 1225(b) absent specific national security concerns. Accordingly, Petitioner's procedural Due Process claim must be assessed based on his individual circumstances.

   In considering whether a petitioner's detention has been unreasonably prolonged – thereby entitling the petitioner to a bond hearing – courts in this District consider the so-called <u>Sajous</u> factors: (1) "the length of time the alien has already been detained"; (2) "whether the alien is responsible for the delay"; (3) "whether the detained alien has asserted defenses to removal"; (4) "whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable"; and (5) "whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention."

Sajous v. Decker, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *10 (S.D.N.Y. May 23, 2018), appeal withdrawn, 2019 WL 4137822 (2d Cir. May 7, 2019)).

Courts in this District also consider (6) "'whether the continued duration of the detention is finite or near conclusion,'" and (7) "'the interests served by the continued detention.'" Vallejo v. Decker, No. 18-CV-5649 (JMF), 2018 WL 3738947, at *3 (S.D.N.Y. Aug. 7, 2018), appeal withdrawn, No. 18-2881, 2019 WL 1503029 (2d Cir. Mar. 25, 2019) (quoting Young v. Aviles, 99 F. Supp. 3d 443, 455 (S.D.N.Y. 2015)).

The "principal factor considered in constitutional review of detention pending removal proceedings is the degree to which the proceedings have been prolonged by unreasonable government action." Debel v. Dubois, No. 13-CV-6028 (LTS), 2014 WL 1689042, at *5 (S.D.N.Y. Apr. 24, 2014).

Here, Petitioner has been detained for twelve months without a bond hearing. Courts have found, in certain circumstances, that the failure to provide a bond hearing after eight to ten months of detention is unreasonable. Sajous, 2018 WL 2357266, at *10 (eight months' detention without a bond hearing unconstitutional); Dukuray v. Decker, No. 18 CV 2898 (VB), 2018 WL 5292130, at *1 (S.D.N.Y. Oct. 25, 2018) (ten months' detention without a bond hearing unreasonable). Courts have, however, found longer time periods not unreasonable in circumstances similar to those here. See, e.g., Adler v. U.S. Dep't of Homeland Sec., No. 09 CIV.4093 (SAS), 2009 WL 3029328, at *2 (S.D.N.Y. Sept. 22, 2009) (finding 15 months reasonable where "there is no evidence in the record that the government has dragged its feet"); Johnson v. Orsino, 942 F. Supp. 2d 396, 409 (S.D.N.Y. 2013) (finding 15 months reasonable where "[t]he sole reason that [petitioner] continues to be in ICE custody is the fact that [he] r Petitioner, it is not dispositive.

As to responsibility for the delay in resolving the removal proceedings, the Government argues that the delay is attributable to Petitioner, because he "had the opportunity to evince an intent to depart the United States . . . but he has not acquiesced to returning to the Dominican Republic. . . ." (Resp. Opp. Br. (Dkt. No. 56) at 38)  Indeed, the removal proceedings against Petitioner have been repeatedly derailed because of his alleged interest in leaving the United States voluntarily.  For example, the 2013 removal proceeding was terminated because Gutierrez had expressed interest in leaving voluntarily, and had not been given an opportunity to leave voluntarily.  (Hernandez Decl. (Dkt. No. 59) ¶ 7)  And the July 2019 removal proceeding was terminated because "ICE failed to demonstrate that Gutierrez was provided the opportunity to depart the United States [voluntarily]. . . ."  (Id. ¶ 13)

After the Government filed the October 2019 removal proceeding, it contacted Petitioner's then-counsel – Yuri Hovhannisyan – and offered Gutierrez the opportunity he had purportedly been seeking to leave the United States voluntarily.  (Id. ¶ 17)  Petitioner's counsel responded that Petitioner "feels he has been treated unjustly in various proceedings, including being brought to the United States unlawfully."  (Id. ¶ 18 & Ex. A)  And at a January 14, 2020 hearing, Petitioner told Immigration Judge Margaret Kolbe "that he would not be filing an application for relief from removal and instead requested a suppression and contested removal hearing."  (Id. ¶ 23)

In her January 30, 2020 decision ordering removal, Judge Kolbe noted that Petitioner (1) "has been provided sufficient opportunity to withdraw his application for admission"; (2) "has been provided many opportunities to file [an] application [for relief from removal] with the [Immigration] Court and he has declined to do so"; and (3) "has not made any application for relief from removal here."  (Jan. 30, 2020 Oral Decision (Dkt. No. 61-4) at 4)

While Petitioner is not required to leave the United States voluntarily, his professed interest in leaving the United States voluntarily repeatedly derailed the removal process, and caused much of the delay at issue. The Court concludes that this factor – what one court has characterized as the "principal factor" in the <u>Sajous</u> analysis – weighs in favor of Respondents. <u>Debel</u>, 2014 WL 1689042, at *5.

As to Petitioner's defenses to removal – while he has asserted such – this Court is mindful that as someone with two prior narcotics convictions, his right to stay in this country is very much in doubt. The Court concludes that this factor does not weigh heavily in favor of either side.

As to the twelve months Petitioner has spent in immigration detention, that period pales in comparison to the ten-year term of imprisonment he served in connection with his most recent state felony narcotics trafficking conviction. This factor favors Respondents.

Petitioner is being held in a facility that houses both individuals facing criminal charges and immigration detainees. Petitioner is housed in a separate unit at the Orange County Jail, however, and that unit contains only ICE detainees. The Court concludes that this factor does not weigh heavily in favor of either side.

As to whether the removal proceedings are "near conclusion," the Court does not know. Petitioner's BIA appeal is pending, and neither side has provided this Court with an estimate as to how long the appeal – or any subsequent appeal – will remain pending. Given these circumstances, the Court concludes that this factor does not weigh heavily in favor of either side.

As to the Government's interest in Petitioner's continued detention, that interest is compelling here, given the extremely serious drug offense that serves as the basis for removability.  Accordingly, this factor favors Respondents.

In sum, most of the factors are either neutral or favor Respondents.  While the length of detention somewhat favors Petitioner, this factor is outweighed by other factors, including that Petitioner (1) has caused much of the delay; (2) served a much longer period in state prison than he has spent in immigration detention; and (3) committed an extremely serious drug trafficking crime, which gives Respondents a compelling interest in continuing his detention.

Accordingly, Petitioner's procedural due process claim will be denied.

## III.    SEALING MOTION

Respondents have moved to file under seal Petitioner's medical records.  (Dkt. Nos. 62, 63)  These records are "judicial documents" because they are relevant to whether Petitioner has a serious medical need.  Accordingly, they are subject to a presumption of access. Standard Inv. Chartered, Inc. v. Nat'l Assn. of Sec. Dealers, Inc., No. 07 Civ. 2014, 2008 WL 199537, at *3 (S.D.N.Y. Jan. 22, 2008).  This presumption of access is outweighed here by Petitioner's "considerable privacy interest" in his sensitive medical information, however.  The motion to seal will therefore be granted.  United States v. Gotti, No. 17-CR-127 (ARR), 2017 WL 5027990, at *1 (E.D.N.Y. Oct. 30, 2017).

**<u>CONCLUSION</u>**

For the reasons stated above, the Petition is denied.  Petitioner's motion for a

temporary restraining order (Dkt. No. 50) is likewise denied.  Respondents' motion to seal

Petitioner's medical records (Dkt. No. 62) is granted.  Respondents' motion for an extension

<u>nunc</u> <u>pro</u> <u>tunc</u> (Dkt. No. 64) is granted on consent.  The Clerk of Court is directed to terminate

the motions and close this case.

Dated:  New York, New York
          June 10, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

21